THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | No: 21-2013 |
| $81,200.00 IN U.S. CURRENCY, | ) ) ) | |
| Defendant. | ) | |

## VERIFIED COMPLAINT FOR FORFEITURE

NOW COMES the Plaintiff, the United States of America, by Richard Kim, Assistant United States Attorney, and respectfully states as follows:

### Nature of the Action

1.  This is an action *in rem* to enforce the provisions of 21 U.S.C. § 881(a)(6) for the forfeiture of $81,200.00 in U.S. currency, which constitutes (1) moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished in exchange for a controlled substance in violation of the Controlled Substances Act (21 U.S.C. § 801, *et seq.*); (2) proceeds traceable to such an exchange; (3) moneys, negotiable instruments, and securities used or intended to be used to facilitate a violation of the Controlled Substances Act; or (4) property involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1956 (money laundering), and are subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A).

**The Defendants *In Rem***

2. The defendant is $81,200.00 in U.S. currency.

3. The defendant is currently in the custody of the United States.

**Jurisdiction and Venue**

4. This Court has subject matter jurisdiction over an action commenced by the United States under 28 U.S.C. § 1345, and over an action for forfeiture under 28 U.S.C. § 1355(a).

5. Pursuant to 28 U.S.C. § 1355(b)(1)(A), this Court has *in rem* jurisdiction over the defendant and venue is proper in this district because the facts which give rise to this forfeiture occurred in Macon County, Illinois.

**Basis for Forfeiture**

6. The defendant is subject to forfeiture pursuant 21 U.S.C. § 881(a)(6) because it constitutes (1) moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished in exchange for a controlled substance in violation of the Controlled Substances Act (21 U.S.C. § 801, *et seq.*); (2) proceeds traceable to such an exchange; (3) moneys, negotiable instruments, and securities used or intended to be used to facilitate a violation of the Controlled Substances Act; or (4) property involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1956 (money laundering).

**Facts**

7. On July 23, 2020, law enforcement initiated a traffic stop on a silver 2020 Chevrolet Tahoe (Tahoe) traveling eastbound on Interstate 72 at milepost marker 138 in Decatur, Illinois. Law enforcement approached the Tahoe and asked the driver for her license and vehicle registration, who was identified as Armonii Aliza Jackson (Jackson) from Flint, Michigan. The Tahoe was registered to PV Holding Corp., 5721 West 96th Street, Los Angeles, California (registration number 8NYL366), also known as Avis. The passenger of the Tahoe, who was reclined in the front seat and not wearing a seatbelt, provided the Avis rental agreement to law enforcement (later identified as Tiakawa Leondis-Terrell Pierce (Pierce) from Flint, Michigan). Law enforcement advised Jackson and Pierce that the Tahoe was stopped for following too closely, and a written warning would be issued to Jackson.

8. Jackson was requested that she come back to the squad car for law enforcement to complete a written warning. At that time, law enforcement noted that the Avis rental agreement showed a pick-up/drop off location of 3425 West Bristol Road Flint, Michigan (located at Bishop International Airport). The Tahoe was rented on July 14, 2020 and should have been returned to Avis two days prior to the traffic stop, or on July 21, 2020. The Tahoe was rented by a third party, Jasmine J. Stephen (Stephen), who was not present during the traffic stop. When Jackson was questioned about Stephen, Jackson advised that she (Stephen) was Pierce's "baby momma."

9. When questioned about their travel plans, Jackson advised that they were headed home from Texas. Jackson said they had been in Texas a day or two, but then changed her answer to three days after pausing for a moment. Jackson said the reason for the trip was "just visiting" Terrell's family and "believed" it was in Denton, Texas. At that time, law enforcement noted that Jackson had labored breathing and constantly looked away when answering questions about their trip and travel plans. When law enforcement reminded Jackson that she was only receiving a written warning for the traffic violation, which would not affect her driver's license or make a financial impact, Jackson's labored breathing did not subside. Due to Jackson's behavior, law enforcement asked if she had ever been in trouble with the police. Jackson responded "it's been a minute" since she had been arrested (meaning it was a while ago) but did not have any warrants.

10. Law enforcement ran a search of Jackson's criminal history, which revealed that she had a prior arrest for dangerous drugs in Michigan on September 11, 2016. The disposition on file for the arrest on September 11, 2016, indicated that a warrant had been requested by the prosecutor. When law enforcement questioned Jackson about that arrest, Jackson waited approximately 9 seconds before answering, "I think speeding." Law enforcement knew Jackson was being dishonest about her criminal history. When asked about her relationship with Pierce, Jackson explained that Pierce was like a boyfriend, who she knew as Terrell.

4

11. At that time, an additional officer arrived on scene, along with "Maco," a canine trained and certified for narcotics detection with the Macon County Sheriff's Department. The canine officer questioned Jackson briefly about their travel plans, and Jackson confirmed that they drove straight for 16-17 hours from Flint, Michigan, to Denton, Texas, to visit Pierce's cousins. Jackson said they were returning home from Texas and had been on the road for about 10 hours when they were stopped by law enforcement.

12. While in the squad car, Jackson's breathing became more labored, and she was moving around in her seat. Jackson's behavior led the officer to believe that she was became increasingly nervous when the canine and handler arrived on scene and started to ask her questions. Due to this increased nervous behavior, Jackson was asked again about her criminal history. Specifically, Jackson was asked whether or not she had any bad run-ins with the police. Jackson responded by asking if it was related to the "Oklahoma case" and went on to explain that she had been arrested for less than an ounce of cannabis. Jackson further explained that while the cannabis was legal in Michigan, she had been arrested with "possession with intent to transport" in Oklahoma.

13. When law enforcement told Jackson that she seemed nervous when being questioned about her past criminal history, Jackson cut off the officer and said "I'm not nervous." Jackson was told that if law enforcement ended up finding a small amount of marijuana in the Tahoe, they would not make a big deal of it. In response, Jackson said

5

she did not have any marijuana in the Tahoe and had not been arrested for anything drug related in the past. Based on a criminal history search of Jackson, law enforcement knew that Jackson was again being dishonest, as she had a prior arrest for a drug-related crime in September 2016.

14.     The canine officer approached the passenger's side of the Tahoe and made contact with Pierce. Pierce provided his driver's license to the canine officer at that time. Pierce, who had been on a Facetime video chat with an unknown black male as the officer approached the Tahoe, was told to disconnect the video chat. Once Pierce disconnected Facetime, he was asked about the rental agreement and who rented the Tahoe. Pierce responded that the mother of his child rented the Tahoe for him, but that he and Jackson were romantically involved.

15.     Pierce confirmed his travel plans with the canine officer, advising that he and Jackson had traveled from Flint, Michigan to Denton, Texas. Pierce said they left Michigan on Sunday night, July 19, 2020, and arrived in Denton, Texas, on Monday, July 20, 2020. When the canine officer asked for the purpose of their trip, Pierce responded that he went to look for cars as a birthday gift to his son. When law enforcement asked if Pierce had visited anyone while in Denton, Texas, Pierce initially stated "no" but then quickly added that they visited his brother. Pierce confirmed that he intended to purchase a car for his son. Law enforcement noted that for Pierce to have a son at or near the legal driving age would be impossible as Pierce's license indicated he was only 23 years old.

6

16. When asked if he had anything that belonged to him in the Tahoe, Pierce replied that he had a black suitcase in the trunk and some money in the center console totaling "9, 10 thousand." Pierce denied having any drugs in the Tahoe, but said he had cannabis while in Texas. Pierce said he had "never" been arrested before for illegal drugs, which based on a prior search of Pierce's criminal history, law enforcement knew Pierce was being dishonest. Law enforcement located multiple bills loose in the pockets of his shorts, which Pierce described as "only being a couple of hundred dollars."

17. At that time, Maco was deployed to conduct a free air sniff on the outside of the Tahoe and made a positive alert to the odor of narcotics. Following the canine's positive alert, the officer saw Pierce make a subtle movement to look in the direction of the backseat on the driver's side. After Maco's deployment, the canine officer walked back to the squad car and handed Pierce's driver's license to the officer in the squad car while Jackson was still present. Pierce's driver's license listed his first name as Tiakawa and not Terrell as Jackson had previously reported. When Jackson was asked to clarify how she knew Pierce and about their travel plans, Jackson responded that she knew Pierce by his second middle name and pointed to Terrell on his driver's license. Jackson also responded that the only purpose of their trip was to visit Pierce's cousins and not his brother. When questioned about any items that belonged to her in the Tahoe, Jackson replied that she had a Tommy Hilfiger bag, a purse and a makeup bag inside but denied having any drugs, weapons or currency.

18. While Jackson was being questioned, law enforcement ran multiple criminal history searches for Pierce which revealed that he had several aliases for his name, along with different dates of birth and Social Security numbers. Criminal history searches also revealed that Pierce had a recent felony charge in Flint, Michigan, on February 8, 2019, for cocaine possession with intent to distribute, and multiple arrests for drugs, armed robbery, carjacking, assault and weapons.

19. At that time, law enforcement brought Pierce to the squad car and requested that he sit in the backseat with Jackson while the Tahoe was searched. Law enforcement advised Jackson and Pierce that they would be recorded while in the squad car. As law enforcement walked away from the squad car to search the Tahoe, Jackson and Pierce could be heard discussing their traffic stop.

20. During a search of the Tahoe, law enforcement located an orange prescription bottle for cough syrup containing suspected Codeine in the center console next to a large sum of rubber banded U.S. currency. Information, including the patient's name and the contents in the bottle, had been blacked out with a marker. Law enforcement was able to identify that the cough syrup had been prescribed to "Sherry." Law enforcement noticed tooling marks on some of the bolts and screws at the base on the center console/armrest, which was very uncommon and indicated the bolts and screws had been removed after the Tahoe left the factory. Law enforcement removed the bolts/screws to search for additional contraband, but none was found.

21. In the front passenger's door pocket, a Mountain Dew bottle containing an orange/brown liquid was discovered. Based on law enforcement's training and experience, drug users and dealers often mix soda with cough syrup to sell or ingest to get a high, which is commonly referred to as a "lean" drink.

22. Law enforcement also observed that the carpeting under the steering column on the driver's side was loose and not fastened under the plastic trim. The carpet was pulled back and a tan rubber band was discovered, which was identical to the rubber bands holding the U.S. currency found in the Tahoe's the center console.

23. In the backseat of the Tahoe, a white cloth bag was located by law enforcement. Inside the white cloth bag was $2,000.00 in U.S. currency, which was wrapped in two separate bundles (containing $1,000.00 each), and a glass mason jar with a small amount of cannabis. The cannabis field tested positive.

24. Upon searching the trunk area of the Tahoe, law enforcement found that the compartment for the jack was empty. Concealed inside the left rear quarter panel of the Tahoe, which was accessible through the jack compartment, was a large amount of U.S. currency. At that time, law enforcement could hear Pierce make a statement to Jackson in the squad car about "swallowing a dime" (meaning that Pierce swallowed a dime bag of some unknown substance). Jackson could be heard whispering something inaudible, and Pierce responds "Ah man, you (inaudible) done messed up man."

25. After discovering the defendant currency in the Tahoe and on Pierce's person, which totaled $81,200.00, law enforcement spoke to Pierce again about how

much money was inside the Tahoe. Pierce responded there was "like 10 thousand" but did not mention the U.S. currency located in the jack compartment/rear quarter panel area. When asked if there was any other money in the Tahoe and where it was located, Pierce interrupted law enforcement and said that he was "hiding the money in the back to buy a Corvette." Pierce said there was "probably 60 (thousand) for the Corvette," and he hid the money because he did not want them (law enforcement) to find it. When Pierce was asked for the car dealership's name, Pierce stuttered and said he utilized a private seller "in Texas" that he found on Facebook Marketplace. When further questioned about the color and mileage of the Corvette, Pierce paused, held his breath, looked up at the ceiling, and said it was "uh, white" with 46,000 miles.

26. As law enforcement walked away from the squad car to continue a search of the Tahoe, Pierce was heard on the audio talking about his money and said it was "definitely over now." In response, Jackson whispered that "anything over ten thousand dollars can be seized," to which Pierce replied "Damn, that shit is gone." Pierce also said "Listen, they know how much unemployment, stimulus checks there is." Jackson responded by asking Pierce if that was what he was going to say (to law enforcement) and then pointed to the logo on her shorts. Pierce replied "Money ain't illegal though."

27. Law enforcement approached Pierce to ask for specific information on the Corvette. Pierce replied that he was interested in a white 2015 Corvette but did not purchase it. Pierce followed up stating he was "legit" and had his own clothing line, as

he pointed to the logo on Jackson's shorts. When asked if he withdrew any of the U.S. currency that was found in the Tahoe from a bank, law enforcement noticed that Pierce broke eye contact and began stammering about unemployment, started rubbing his thighs and scratching his neck. When asked if he withdrew his unemployment money from the bank, Pierce responded "yes" and told law enforcement he had a bank account at Hunnington Bank. Pierce was asked when he withdrew a majority of the U.S. currency that was located in the Tahoe and, in response, Pierce sighed repeatedly and said the money had not been recently withdrawn.

28. When questioned again specifically about the $2,000.00 in U.S. currency found in the white cloth bag in the backseat, Pierce told law enforcement he withdrew it from Federal Bank. Pierce said "I ain't even going to lie, a majority of it (the money) came from unemployment and stimulus checks" from two businesses he owned, Millionaire Vibes (a clothing line business) and Millionaire Cuts (a barbershop), and some of the money came from his "baby momma." Pierce reported that he received $1,600 to $1,700 in unemployment and that he got $15,000 in "backpay." Pierce was asked if his barbershop clients paid by cash or credit and if he paid taxes on that income. Pierce replied that a majority of his clients paid in cash and that "No, um, you know, barbers don't pay taxes. It's self-employment." For his clothing line business, Pierce explained to law enforcement that he would buy clothes and then put a Millionaire Vibes' logo on it to sell. When asked if he paid taxes on his clothing line

11

business, Pierce responded "They ain't, I ain't" but later said "yes, sir, I ain't got shit for it."

29. Law enforcement again questioned Pierce about the Corvette's seller. Pierce responded that he was unable to provide the seller's name on Facebook Marketplace and did not exchange messages with the seller through Facebook Messenger. Pierce responded that he did call the seller and had messages on his phone where he had looked into buying cars.

30. Law enforcement spoke with Jackson again outside the presence of Pierce. In summary, Jackson advised law enforcement that they went to Texas to look at a 2015 Corvette with low miles for $50,000.00, but Pierce did not buy the car as it was dented. Jackson went with Pierce to Texas so she could drive the rented Tahoe or the Corvette back to Michigan after Pierce purchased it. In addition to going to Texas for the Corvette, Jackson advised they wanted to get away to visit Pierce's family because a friend of theirs had been murdered on the 4th of July. Jackson said they visited "Lee," one of Pierce's cousins. Jackson admitted to law enforcement that the cannabis shake found in the glass mason jar was her's, but had no idea about the money that was found in the Tahoe. Jackson reported that she was unemployed and received $1,300.00 every two weeks. Following her discussion with law enforcement, Jackson returned to the backseat of the squad car and Pierce stepped outside for further questioning.

31. As law enforcement began questioning Pierce, he said he wanted to speak privately with them out of Jackson's view. Pierce followed-up by stating that for the last

1 ½ years he had been an active informant buying cocaine for the Federal Bureau of Investigation (FBI) in Flint, Michigan. Pierce said he agreed to cooperate and become an active informant after he was arrested for distributing cocaine. When questioned again about their travel plans, Pierce confirmed that he went to Texas to purchase a white 2015 Chevrolet Corvette with 46,000 miles for $60,000.00. Pierce said that a guy showed up with the Corvette at an unknown parking lot, which had a $5,000 to $6,000 dent, so he decided not to buy it and left.

32. Pierce advised he had two cellphones in the Tahoe. Pierce consented to law enforcement searching the two cellphones but with the condition that it was done manually with him present. During a manual search of the two cellphones, law enforcement observed several text messages, photos and videos depicting drug dealing and money laundering, which included photos of digital scales that appeared to have cocaine/drug residue and photos of Pierce holding large sums of U.S. currency wrapped in rubber bands. An exchange of text messages between Jackson and Pierce about their upcoming travel to Texas implied that Pierce had paid Jackson to accompany him on this trip.

33. Law enforcement made contact with the FBI. The FBI disclosed that Pierce had been used as an informant earlier in the year by FBI/DEA to buy large quantities of cocaine (½ kilograms of cocaine for $17,000.00) in the Detroit/Flint, Michigan area. The FBI also disclosed that Pierce's informant file had been closed, as he was under investigation and could face criminal charges for lying in Federal Court.   The FBI

reported that Pierce would break down the cocaine and rock it up himself to sell. The FBI described Pierce as a large-scale distributor operating a drug trafficking organization, a leader within a gang organization, and a violent offender who was involved in multiple shootings, car jackings, and robberies in the past.

34. Law enforcement transported the defendant currency to the garage of DEA's Springfield Resident Office, where the defendant currency was placed in one of four boxes prior to an Illinois State Police trooper arriving with his canine named "Riggs." Riggs, a canine trained and certified for narcotics detection, and his handler went inside the garage to conduct the free air sniff of the four boxes. Riggs made a positive alert for the presence of narcotics on box number four which was the box that contained the defendant currency.

35. On July 28, 2020, agents received a phone call from Tiakawa Pierce. In summary, Pierce said all the money seized during the traffic stop was legitimate, as it was income from rental properties he owned and from withdrawing all of the cash from his bank because of COVID-19.

36. On August 10, 2020, Pierce called agents again and agreed to come to Springfield, Illinois, on August 11, 2020, along with all of the documentation he had to prove the defendant currency was legitimate (Pierce had previously made arrangements to meet with agents on August 3, 2020, but was a no call/no show). On August 11, 2020, Pierce arrived in Springfield, Illinois, but agents were unavailable at that time and they explained they could meet with him later in the day. Pierce said he could not wait as he

had to get back to Flint, Michigan, because he was expecting a package. Pierce followed up stating that his company's name was an LLC called Millionaire Vibes, and that the company was listed under the names of two females (Pierce mentioned Stephen's name).

  37. On August 12, 2020, Pierce and law enforcement spoke by phone. In summary, Pierce said Millionaire Vibes is an LLC that he owned with Stephen. Pierce said the LLC is in both of their names, unlike what he told law enforcement the day before. Pierce, however, did not know the business address for Millionaire Vibes. Pierce first said the LLC was formed in 2017 but then changed the date to 2018. Pierce said he did not start working at the business until 2019. Pierce said his annual sales in 2019 were $50,000 to $60,000. When asked about his prior statement to them during the traffic stop that he did not file taxes for the business, Pierce said he did not know what the agent was talking about. Later Pierce said he never filed taxes but changed his story again, stating that he was going to file taxes, but was going to wait two years before filing taxes because someone told him to do that. Pierce said he kept a record of his business transactions and had receipts. For his business, Pierce said he bought clothing, sandals, etc. in New York from wholesalers and people on the street and then added the Millionaire Vibes logo. Pierce would do the same with merchandise he purchased from H & M clothing store, where he has spent between $1,400.00 and $1,500.00.  Pierce stated he did not know this might be illegal, as he did not have permission or a contact with H & M. Pierce said he filed a copyright for Millionaire Vibes in Michigan. Regarding the rental properties he owned, Pierce said (a) the property address was 3602 Mason Street in Flint, Michigan; (b)

he paid $10,000.00 (Pierce later changed the amount to $7,000.00); (c) he purchased it in 2016 (Pierce later changed the date to 2015) from his friend "Joshua" but did not know Joshua's last name; (d) he invested $3,000 prior to it being rented; and (e) received $600.00 a month from his current renter named Desmond Hodo.

38. Following the phone call with Pierce, law enforcement spoke to Stephen. In summary, Stephen said law enforcement was contacting her because some of "their" money was seized but when asked for the amount, Stephen did not know. Stephen said Pierce was traveling with all the money because he was going to purchase a Corvette or Escalade. Stephen confirmed that she rented the Tahoe for four weeks for $1,500.00. Stephen said their business was a DBA filed in 2018 and not an LLC. Stephen's "tax lady" advised her not to file taxes for three years. In 2019, Millionaire Vibes made $19,000.00 (Pierce previously said it was between $50,000.00 and $60,000.00). In 2020, Stephen did not do much business because of COVID, but received $10,000.00 in unemployment. Stephen said they bought bulk clothing in New York and oversees and spent $600.00 total (Pierce previously stated it was $1,400.00 to $1,500.00). Stephen did not know how much money was hidden in the Tahoe but knew Pierce was going to pay between $40,000.00 to $50,000.00 for a Corvette. When law enforcement explained that even after adding up all the amounts of money she and Pierce claimed to have received, it did not add up to the amount of money that was seized. Stephen then responded that she received $35,000.00 for an insurance claim for items stolen in her residence, and she gave $20,000.00 to Pierce as a gift because "he does a lot for me." Stephen owned another business called Beauty

Hair Collection. In 2018, she filed taxes on Beauty Hair Collection but did not in 2019, as she only made $20,000.

39. Jackson's criminal history revealed one arrest for dangerous drugs. A criminal history search for Pierce revealed convictions for dangerous drugs and carjacking, and arrests for armed robbery, weapon by felon, and theft.

40. Based on the detailed facts above, which support a reasonable belief that the government will be able to meet its burden of proof at trial, the defendant is subject to forfeiture pursuant 21 U.S.C. § 881(a)(6) because it constitutes (1) moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished in exchange for a controlled substance in violation of the Controlled Substances Act (21 U.S.C. § 801, *et seq*.); (2) proceeds traceable to such an exchange; (3) moneys, negotiable instruments, and securities used or intended to be used to facilitate a violation of the Controlled Substances Act; or (4) property involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1956 (money laundering), and are subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A).

WHEREFORE, the United States of America prays that this Court enter an order forfeiting the defendant to the United States of America for disposition according to law, for the issuance of a warrant *in rem*, for costs of suit, and for such other relief as the Court may deem necessary.

Respectfully submitted,

JOHN C. MILHISER
UNITED STATES ATTORNEY

By: s/Richard Kim
Richard Kim, IL Bar No. 6226879
Assistant United States Attorney
United States Attorney's Office
318 South Sixth Street
Springfield, IL 62701
Telephone: 217-492-4450
Email: richard.kim@usdoj.gov

VERIFICATION

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct based on information and belief.

Executed on this 22nd of January, 2021.

                                        s/Luke Edson

                                        Luke Edson, Special Agent
                                        Drug Enforcement Administration

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
United States of America

### DEFENDANTS
$81,200.00 in U.S. Currency

**(b)** County of Residence of First Listed Plaintiff
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

[X] 1 U.S. Government Plaintiff
[ ] 2 U.S. Government Defendant
[ ] 3 Federal Question *(U.S. Government Not a Party)*
[ ] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated or Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated and Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | [X] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane / [ ] 365 Personal Injury - Product Liability | [ ] 690 Other | [ ] 423 Withdrawal 28 USC 157 | [ ] 400 State Reapportionment |
| [ ] 130 Miller Act | [ ] 315 Airplane Product Liability | | | [ ] 410 Antitrust |
| [ ] 140 Negotiable Instrument | [ ] 320 Assault, Libel & Slander / [ ] 367 Health Care/Pharmaceutical Personal Injury Product Liability | | **PROPERTY RIGHTS** | [ ] 430 Banks and Banking |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment | | | [ ] 820 Copyrights | [ ] 450 Commerce |
| [ ] 151 Medicare Act | [ ] 330 Federal Employers' Liability / [ ] 368 Asbestos Personal Injury Product Liability | | [ ] 830 Patent | [ ] 460 Deportation |
| [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans) | [ ] 340 Marine | | [ ] 840 Trademark | [ ] 470 Racketeer Influenced and Corrupt Organizations |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | [ ] 345 Marine Product Liability | **LABOR** | **SOCIAL SECURITY** | [ ] 480 Consumer Credit |
| | | [ ] 710 Fair Labor Standards Act | [ ] 861 HIA (1395ff) | [ ] 490 Cable/Sat TV |
| [ ] 160 Stockholders' Suits | [ ] 350 Motor Vehicle / **PERSONAL PROPERTY** | | [ ] 862 Black Lung (923) | [ ] 850 Securities/Commodities/ Exchange |
| [ ] 190 Other Contract | [ ] 355 Motor Vehicle Product Liability / [ ] 370 Other Fraud | [ ] 720 Labor/Management Relations | [ ] 863 DIWC/DIWW (405(g)) | [ ] 890 Other Statutory Actions |
| [ ] 195 Contract Product Liability | [ ] 360 Other Personal Injury / [ ] 371 Truth in Lending | [ ] 740 Railway Labor Act | [ ] 864 SSID Title XVI | [ ] 891 Agricultural Acts |
| [ ] 196 Franchise | [ ] 362 Personal Injury - Medical Malpractice / [ ] 380 Other Personal Property Damage | [ ] 751 Family and Medical Leave Act | [ ] 865 RSI (405(g)) | [ ] 893 Environmental Matters |
| | / [ ] 385 Property Damage Product Liability | [ ] 790 Other Labor Litigation | | [ ] 895 Freedom of Information Act |
| | | [ ] 791 Employee Retirement Income Security Act | | [ ] 896 Arbitration |
| **REAL PROPERTY** | **CIVIL RIGHTS** / **PRISONER PETITIONS** | | **FEDERAL TAX SUITS** | [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| [ ] 210 Land Condemnation | [ ] 440 Other Civil Rights / **Habeas Corpus:** | | [ ] 870 Taxes (U.S. Plaintiff or Defendant) | |
| [ ] 220 Foreclosure | [ ] 441 Voting / [ ] 463 Alien Detainee | | [ ] 871 IRS—Third Party 26 USC 7609 | [ ] 950 Constitutionality of State Statutes |
| [ ] 230 Rent Lease & Ejectment | [ ] 442 Employment / [ ] 510 Motions to Vacate Sentence | | | |
| [ ] 240 Torts to Land | [ ] 443 Housing/Accommodations / [ ] 530 General | | | |
| [ ] 245 Tort Product Liability | [ ] 445 Amer. w/Disabilities - Employment / [ ] 535 Death Penalty | **IMMIGRATION** | | |
| [ ] 290 All Other Real Property | | [ ] 462 Naturalization Application | | |
| | [ ] 446 Amer. w/Disabilities - Other / **Other:** / [ ] 540 Mandamus & Other | [ ] 465 Other Immigration Actions | | |
| | [ ] 448 Education / [ ] 550 Civil Rights | | | |
| | / [ ] 555 Prison Condition | | | |
| | / [ ] 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*
[X] 1 Original Proceeding
[ ] 2 Removed from State Court
[ ] 3 Remanded from Appellate Court
[ ] 4 Reinstated or Reopened
[ ] 5 Transferred from Another District *(specify)*
[ ] 6 Multidistrict Litigation

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
21 U.S.C. § 881(a)(6), 18 U.S.C. § 1956, 18 U.S.C. § 981(a)(1)(A)
Brief description of cause:
Civil Forfeiture Action

## VII. REQUESTED IN COMPLAINT:
[ ] CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.
DEMAND $
CHECK YES only if demanded in complaint:
**JURY DEMAND:** [ ] Yes [X] No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE
DOCKET NUMBER 21-2013

DATE

SIGNATURE OF ATTORNEY OF RECORD
s/Richard Kim

**FOR OFFICE USE ONLY**

RECEIPT #    AMOUNT    APPLYING IFP    JUDGE    MAG. JUDGE